IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18-cr-00797-4 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| DERRICK CLAIBORNE ) | |

**MEMORANDUM OPINION AND ORDER**

A grand jury has indicted Defendant Derrick Claiborne for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Claiborne has now filed a motion to suppress evidence of the three handguns found in his car during a traffic stop in Chicago that form the basis for that charge. (Dkt. No. 151.) The Government contends that the officers who stopped Claiborne had probable cause to search his vehicle and, alternatively, that the officers had a reasonable articulable suspicion sufficient to perform a protective sweep of the car once they had ordered Claiborne to exit it. Because the Court finds that there was probable cause to search Claiborne's car, his motion to suppress evidence is denied.

BACKGROUND

Because Claiborne challenges a warrantless search of his vehicle, the Government bears the burden of establishing probable cause or reasonable suspicion. *See United States v. Longmire*, 761 F.2d 411, 417–18 (7th Cir. 1985). The Court notes at the outset that this motion is being decided based on the parties' written submissions, as no evidentiary hearing is necessary. Evidentiary hearings on motions to suppress "are not granted as a matter of course," *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998), and Seventh Circuit precedent "places the onus on a defendant seeking an evidentiary hearing" specifically to allege disputed material facts that justify a hearing. *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007); *see also United*

*States v. Clark*, 935 F.3d 558, 568 (7th Cir. 2019); *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011). An evidentiary hearing was not necessary in this case because the operative facts are not in dispute and there are no material issues of credibility for the Court to resolve. Those operative facts are as follows.

A joint task force of officers from the Chicago Police Department ("CPD") and agents from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") were investigating an operation smuggling firearms from Missouri to Chicago. The key actors in the operation were believed to be Jumonta Moore and James Saunders. According to the second superseding indictment and reports filed by ATF agents, it was believed that Moore obtained guns in Missouri and drove them across the state line to Illinois. (Dkt. Nos. 138, 165-4, 165-5.) Moore brought the guns to Saunders's apartment in Chicago. Saunders then took the guns and sold them out of his apartment to third parties, among them confidential informants ("CIs") working for the ATF. The Government has submitted ATF reports, surveillance camera video, and photographs that document three incidents in which Saunders sold firearms to persons other than Claiborne.

The first sale took place on June 20, 2018. (Resp. in Opp'n to Mot. to Suppress Evid. ("Resp. in Opp'n"), Ex. 4 ¶ 1, Dkt. No. 165-4.) That day, Saunders texted a person who was working as a CI, attaching a photograph of five handguns. (*Id.*) Saunders and the CI then had a phone conversation that the CI recorded, in which Saunders gave the CI prices for the guns. (*Id.* ¶ 2.) Saunders and the CI subsequently engaged in several more recorded phone calls in which the CI offered to pay extra so that Saunders would not sell the guns to other buyers and Saunders told the CI to come to his apartment. (*Id.* ¶¶ 3–6.) The CI went to Saunders's apartment, accompanied by another person who was working with law enforcement. (*Id.* ¶¶ 7–9.) Saunders told them to pull up behind the building and he would be waiting on the back porch. (*Id.* ¶ 11.) The CI went up

the back stairs and entered the apartment. (*Id.* ¶¶ 13, 15.) He gave Saunders a total of $1,400 for two guns, which Saunders placed in a plastic bag for him. (*Id.* ¶ 15.) The CI then left Saunders's apartment by the back stairs and went down to his car. (*Id.*)

The second sale occurred on September 23, 2018. (Resp. in Opp'n, Ex. 6 ¶ 1, Dkt. No. 165-6.) Saunders initiated the transaction on September 11, 2018 by texting the same CI mentioned above. (*Id.*) Through a pen register, ATF agents saw that, shortly after Saunders texted the CI, Saunders was in contact with a cellphone known to be used by Moore. (*Id.* ¶ 2.) After his call with Moore, Saunders texted the CI again, this time attaching a photograph of three handguns. (*Id.* ¶ 3.) The CI and Saunders had several recorded phone calls and numerous text messages over the following two weeks. (*Id.* ¶¶ 4–9.) On September 23, the CI went to buy the guns at Saunders's apartment. (*Id.* ¶ 10.) Before the CI went there, he had several more phone conversations with Saunders about Saunders's efforts to meet up with a third person who is not identified in the ATF report. (*Id.* ¶¶ 12–16.) Before the CI arrived at Saunders's apartment, surveillance officers saw an unknown man and woman go up the back stairs into Saunders's apartment. (*Id.* ¶ 18.) Saunders then came down the stairs with the man, opened the trunk of the man's car, and went back up the stairs. (*Id.* ¶ 21.) When the CI drove into the rear of the building, Saunders came down with the unknown man, opened the trunk, pulled out a large object wrapped in clothing, and placed it in the trunk of the CI's car. (*Id.* ¶ 22.) That object contained two firearms. (*Id.* ¶ 24.) The CI and Saunders talked through the car window, the CI handed over $1,600, and then the CI drove away. (*Id.* ¶¶ 22, 25.) Surveillance officers got the Missouri license plate number of the unknown man and woman and found that it was registered to a woman who officers knew to be the girlfriend of Marcus Ingram, a man who they believed to be involved in

3

the firearms-trafficking operation. (*Id.* ¶¶ 23, 28.) In a debriefing session a few days later, the CI identified a photograph of Ingram as the unknown man who was at the transaction. (*Id.* ¶ 29.)

The third and final sale occurred on October 12, 2018. (Resp. in Opp'n, Ex. 8 ¶ 1, Dkt. No. 165-8.) On October 11, Saunders contacted a second CI working with law enforcement by sending a text message accompanied by a photo of three guns. (*Id.* ¶ 2.) This CI indicated interest in buying the guns. (*Id.* ¶ 3.) At the same time, ATF agents monitored the GPS coordinates of a cellphone number associated with Ingram, which showed him driving north from Missouri to Illinois. (*Id.* ¶ 4.) Saunders and the CI agreed to meet, and the pen register showed Saunders communicating with a cellphone that had an area code from eastern Missouri. (*Id.* ¶¶ 5–9.) Surveillance officers witnessed a car pull up behind Saunders's building and a man and woman walk up the stairs. (*Id.* ¶ 12.) Surveillance video showed the man pulling an object out of the trunk before going up to Saunders's apartment and that the car had Missouri plates registered to Ingram's girlfriend. (*Id.* ¶ 21.) Meanwhile, ATF agents observed that the GPS location for Ingram's phone was at or near Saunders's building. (*Id.* ¶ 13.) Soon after, the CI arrived at the back of Saunders's building. (*Id.* ¶ 16.) Saunders came down the stairs with a large object in his hand. (*Id.*) He talked to the CI from the window for a short time and then walked back up the stairs as the CI drove away. (*Id.*) In the transaction, the CI paid Saunders $2,300 and received three handguns in a plastic bag. (*Id.* ¶¶ 17–18.)

Although the task force surveilled Moore and Saunders throughout 2018, the officers were unaware of Claiborne and his involvement in the trafficking until November 2, 2018. That day, an ATF agent observed Moore's car on the surveillance camera parked behind Saunders's building. (Resp. in Opp'n, Ex. 1, Sub-Ex. 1 ¶ 65, Dkt. No. 165-1.) Moore and another man exited the car. (*Id.*) The other man was carrying a large object. (*Id.*) The two men went upstairs to Saunders's

4

apartment. (*Id.* ¶ 66.) After they left, the agent monitored the pen register for Saunders's phone and noticed contact between it and a Chicago phone number the agent did not recognize. (*Id.* ¶ 67.) Agents quickly established that the number was registered to Claiborne. (Resp. in Opp'n, Ex. 14, Dkt. No. 165-14.) The pen register showed eight phone calls and eight text messages between Saunders's phone and the number associated with Claiborne over the next few hours. (Resp in Opp'n, Ex. 1, Sub-Ex. 1 ¶ 68.) ATF agents looked up Claiborne's criminal history and found state-court convictions for firearms possession and controlled substances. (Resp. in Opp'n ¶ 8(b); *id.* Ex. 14; *id.* Ex. 15, Dkt. No. 165-15.) Agents also discovered through law enforcement databases that Claiborne was the registered owner of a silver Jeep Grand Cherokee and noted the car's Illinois license plate number. (Resp. in Opp'n Ex. 14; *see also id.* Ex. 1, Sub-Ex. 1 ¶ 67.)

Shortly after that phone contact, Saunders came down his building's back stairs as a silver Jeep Grand Cherokee pulled into the parking lot. (Resp. in Opp'n, Ex. 1, Sub-Ex. 1 ¶ 69.) Saunders was carrying a white plastic bag. (*Id.*) He got in the Jeep's passenger side and got out of the car less than a minute later without the bag. (*Id.*) The Jeep then pulled out of the parking lot. (*Id.* ¶ 70.) CPD officers and an ATF agent followed the Jeep away from Saunders's building. (*Id.* ¶¶ 70–71.) While following the car, they confirmed that it had the same license plate that ATF agents had confirmed for the silver Jeep Grand Cherokee registered to Claiborne. (*Id.* ¶ 70.) After confirming the license plate numbers, they pulled the Jeep over on the pretext that Claiborne's license plate was expired. (*Id.* ¶¶ 70–71.)[1] The officers identified Claiborne based on a driver's license photo they had seen in a state database before pulling the Jeep over. (Resp. in Opp'n, Ex. 1, Sub-Ex. 1 ¶ 71.) Two more ATF agents arrived shortly after the officers stopped the Jeep. (Resp. in Opp'n, Ex. 2 ¶ 10.)

---

[1] The parties agree that Claiborne's license plate was not actually expired, and the Government contends that the officers lied about their reason for pulling over Claiborne to protect the task force's ongoing investigation. (Resp. in Opp'n at 14, Dkt. No. 165.)

5

At the officers' request, Claiborne exited the vehicle. (*Id.* ¶ 12.) The ATF agent saw the white plastic bag that Saunders had left in the car near the passenger seat. (*Id.*) He asked Claiborne if he had contraband in the car, and Claiborne said he did not. (*Id.*) The agent then asked Claiborne for consent to search the car, which Claiborne denied. (*Id.*) The agent went ahead and searched the car anyway, finding three handguns in a box that was inside the white plastic bag. (*Id.*) While the agent looked inside the car, another agent again confirmed Claiborne's identity by looking at his driver's license. (*Id.*) Claiborne was arrested by CPD once the guns were found in his car. (*Id.*)

Claiborne was taken in for questioning, but he refused to make a statement and was released. (*Id.* ¶¶ 12, 16.) A few weeks later, Claiborne was arrested on a federal charge of being a felon in possession of a firearm and he told ATF agents that the bag with the three guns in his car came from Saunders. (Resp. in Opp'n, Ex. 17, Dkt. No. 165-17.) But in an affidavit accompanying his motion to suppress, Claiborne claims that he did not know what was in the bag Saunders left in his car. (Suppl. to Mot. to Suppress Evid., Ex. 1 ¶ 16, Dkt. No. 155-1.)

The operative indictment contains numerous firearms charges against Moore, Saunders, and Ingram. The only charge against Claiborne is Count XII, which charges him with violating 18 U.S.C. § 922(g)(1) by being a felon in possession of a firearm. With the present motion, Claiborne asks this Court to suppress the three guns on the grounds that the search of his car violated his rights under the Fourth Amendment to the U.S. Constitution.

## DISCUSSION

The Court may suppress evidence gathered in violation of the Fourth Amendment's protection against unreasonable searches and seizures. *See Mapp v. Ohio*, 367 U.S. 643, 648–49 (1961). Subject to a few "well-delineated exceptions," searches conducted without a warrant are

6

*per se* unreasonable. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One important exception is the automobile exception, which allows law enforcement to search motor vehicles without a warrant as long as they have probable cause. *See United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004). With probable cause, law enforcement may search any part of the vehicle in which contraband or evidence could be hidden, including closed containers. *See United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013); *see also California v. Acevedo*, 500 U.S. 565, 572–73 (1991). Probable cause to search a vehicle exists if, "under the totality of the circumstances, it is fairly probable that the car contains contraband or evidence." *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Determinations of probable cause are common-sense judgments in which the Court may account for reasonable inferences that a law enforcement officer would make based on training and experience. *Richards*, 719 F.3d at 754. Probable cause is a lower burden of proof than preponderance of the evidence. *Id.*

   The Government contends that the agent who searched Claiborne's car had probable cause to do so. The Court agrees. On November 2, 2018, members of the task force observed Moore—who they knew had been involved in unlawful firearms sales—walk up to Saunders's apartment carrying a large object. There was a fair probability that Moore was delivering firearms to Saunders, as he and Ingram had both done before. Just after Moore's visit, there was a long series of phone calls and text messages between Saunders and a number associated with Claiborne. While the Government has not submitted evidence about the content of those contacts, the pattern of calls and text messages was consistent with the negotiations in which CIs engaged with Saunders after he texted them photos of firearms. Claiborne then drove to the back of Saunders's apartment building, just as Saunders had instructed the CIs to do.

Saunders came down the stairs carrying a bag. He stepped into Claiborne's car, talked to him briefly, and then exited the car without the bag. That pattern is consistent with Saunders's sales to CIs on September 23, 2018 and October 12, 2018. Claiborne then drove away immediately. Before the traffic stop, ATF agents ran the car's license plate number and confirmed that the car was registered to Claiborne.[2] Agents had already confirmed that Claiborne was the subscriber for the number that had exchanged eight calls and eight text messages with Saunders that morning. Thus, it was likely that the person driving the car was the same person who had been in contact with Saunders earlier that day. Taken together, this information created a fair probability that the car contained contraband.[3]

Claiborne argues that the agents should not be able to use information about other transactions involving Saunders to establish probable cause to search Claiborne's car. It is true that, without the context provided by the rest of the investigation, the officers might not have had probable cause to search Claiborne's car based solely on the observation of Claiborne's and Saunders's phone contact and personal interaction. But it is appropriate to consider the broader context of the investigation in determining whether the agents had probable cause to search Claiborne's car, as demonstrated by two Seventh Circuit decisions.

---

[2] In his motion to suppress, Claiborne repeatedly derides the officers' use of the pretext that his license plate was expired—when the plate had not, in fact, expired—to stop and investigate him for firearms possession. (Mot. to Suppress Evid. at 3, 6–7, Dkt. No. 151.) He does not appear to ask for suppression on the grounds that the pretext made the search of his car invalid. But the Court nonetheless notes that the use of a cover story to avoid revealing an investigation does not negate the existence of probable cause to search a vehicle. *See United States v. Williams*, 627 F.3d 247, 253–54 (7th Cir. 2010).

[3] Claiborne does not argue that evidence should be suppressed because the agents involved in the search lacked knowledge that other agents had. But the Government discusses the issue in depth in its response, so the Court will note that information from agents who were not present during the stop may be imputed to the agents present during the stop through the collective knowledge doctrine. *See Williams*, 627 F.3d at 253; *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000). The use of a pretext for the stop has no impact on the validity of a stop for which probable cause comes from the collective knowledge of various agents. *See Williams*, 627 F.3d at 253–54.

In *United States v. Williams*, the Seventh Circuit affirmed the district court's decision that officers had probable cause to search the defendant's car. 627 F.3d at 252. In that case, law enforcement knew that two men were dealing cocaine out of a house in Chicago because a person who they stopped leaving the house admitted to buying cocaine inside and identified the dealers. *Id.* at 249. Officers had heard a conversation arranging that transaction over a wiretap. *Id.* After getting a statement from that buyer, officers heard a wiretapped conversation in which the dealers said that "the black guy" would be coming to the house. *Id.* Officers surveilled the house and saw two men park by the house and walk to the backyard. *Id.* at 249–50. One of the men was carrying a brown shoebox. *Id.* The men left the yard about fifteen minutes later, still carrying the shoebox, and drove away. *Id.* Officers then stopped and searched the car, finding cocaine in the shoebox. *Id.* at 250. The circumstances in *Williams* are analogous to those here, as the officers only had probable cause to search the car due to the similarity between the defendants' conduct and the conduct of another person who bought drugs at the house.[4] *Id.* at 252. The Seventh Circuit concluded that there was probable cause even though the defendants' conduct—viewed in isolation—could be considered innocent. *Id.*

The Seventh Circuit also affirmed a district court's determination of probable cause for a warrantless search of a car in *Richards*, 719 F.3d at 755. In that case, the officers knew that a CI had purchased cocaine at a residence. *Id.* Officers observed another car approaching the residence in the same manner the CI had, by meeting a second car at a spot on the road. *Id.* The second car led the defendant's car to the residence. *Id.* Both cars pulled into the garage and then both left

---

[4] In his briefs, Claiborne attempts to distinguish *Williams* on the basis that the officers in that case had information from wiretaps indicating that the defendants were involved in drug transactions. But Claiborne misreads *Williams*. In that case, the only information the officers had about the upcoming drug transaction was that the buyer was a black man. *Williams*, 627 F.3d at 249. The officers did not know the buyer's identity or even have a physical description of him. Thus, the officers in *Williams* did not have enough information about the buyer's identity to distinguish *Williams* from this case.

9

after less than ten minutes. *Id.* In this case, Claiborne's interaction with Saunders was quite similar to the conduct of the two CIs who had purchased guns from Saunders before, which creates strong parallels between this case and *Richards*. Thus *Richards*, like *Williams*, supports the conclusion that there was probable cause to search Claiborne's car.

Because there was probable cause to search Claiborne's car, the Court denies Claiborne's motion to suppress the three guns found in his car. As an alternative to its probable cause argument, the Government contends that an ATF agent had reasonable suspicion that justified a protective sweep of the car. *See Michigan v. Long*, 463 U.S. 1032, 1049–51 (1983); *United States v. Holifield*, 956 F.2d 665, 669 (7th Cir. 1992). But because the Court concludes that the agent had probable cause to search the vehicle, the Court declines to address the alternative argument about reasonable suspicion.

## CONCLUSION

For the reasons stated above, the Court finds that the officers had probable cause to search Claiborne's car and his motion to suppress evidence (Dkt. No. 151) is therefore denied.

ENTERED:

Dated: July 13, 2020

Andrea R. Wood
United States District Judge